**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

STARR INDEMNITY & LIABILITY
COMPANY,

               Plaintiff,

v.

PACIFIC AIR HOLDINGS, LLC, AERO
WING EQUIPMENT, LLC, BRAVO
WING EQUIPMENT, LLC, DELTA
WING EQUIPMENT, LLC, and PACIFIC
WINGS, LLC,

               Defendants.

PACIFIC AIR HOLDINGS, LLC, and
DELTA WING EQUIPMENT, LLC,

               Counterclaim Plaintiffs,

v.

STARR INDEMNITY & LIABILITY
COMPANY,

               Counterclaim Defendant.

Case No. CIV-21-510-PRW

**<u>ORDER</u>**

Before the Court are Defendants/Counterclaim Plaintiffs Pacific Air Holdings, LLC

and Delta Wing Equipment, LLC's ("Pacific Air's") Motion for Summary Judgment and

Brief in Support (Dkt. 41); Plaintiff/Counterclaim Defendant Starr Indemnity & Liability Company's ("Starr's") Amended Motion for Summary Judgment (Dkt. 43); Pacific Air's Motion to Compel (Dkt. 48); Pacific Air's Motion to Withdraw Motion for Protective Order (Dkt. 66); and Pacific Air's Motion to Strike Expert Disclosure and Report (Dkt. 67). The motions are fully briefed, and for the reasons given below: the cross-motions for summary judgment are each **GRANTED IN PART** and **DENIED IN PART**; the motion to compel and motion to withdraw are **GRANTED**; and the motion to strike is **DENIED**.

### *Background*[1]

Between 2016 and 2018, Pacific Air, an aircraft leasing company, entered into Aircraft Lease Agreements with two Indonesian companies: PT Spirit Avia Sentosa ("Flying SAS") and PT National Gold West Papua Indonesia ("NGWPI"). These agreements covered the leases of five total Cessna aircraft, three to Flying SAS, and two to NGWPI.[2] In early 2019 the lessees stopped making their lease payments and cut off most communication with Pacific Air. Around the same time, Mr. Lofton, a representative of Pacific Air, was denied access by airport authorities when trying to observe one of the NGWPI aircraft, which was being stored behind a hangar.[3]

In June 2019, Pacific Air filed a pair of lawsuits against the lessees seeking damages and the return of the aircraft. Around August of 2019, Mr. Lofton received photos of the

---

[1] This section is based on the undisputed facts as described in the parties' briefs.

[2] Pacific Air also entered into Aircraft Lease Agreements with PT Asian One Air, which operated the two aircraft leased to NGWPI.

[3] *See* Def.'s Mot. Summ. J. (Dkt. 41), ¶¶ 23–27.

two NGWPI aircraft, and the apparent lack of washing and waxing caused him concern that the aircraft may not be receiving proper maintenance and upkeep. In November 2019, Mr. Lofton and two mechanics were able to briefly inspect the three Flying SAS aircraft before being turned away by airport authorities. One of the aircraft was in good condition, and potentially airworthy, while the other two showed signs of disuse and a lack of care, including dirt, missing parts, and animals possibly nesting within the equipment. Despite these problems, Mr. Lofton believed that the aircraft were repairable if Pacific Air could shortly regain possession and begin maintenance.

In the midst of these developments, Pacific Air obtained a new insurance plan from Starr. Initially, Pacific Air had obtained a secondary contingent coverage plan from Starr, with a policy period of October 31, 2018, to October 31, 2019. That plan ("the 2018-2019 Policy") required that the aircraft lessees maintain primary insurance coverage. In August or September 2019, Mr. Lofton attended a meeting at which he was given reason to suspect that at least one of the aircraft was uninsured by its lessees. After consulting with its insurance broker, Pacific Air decided to obtain full primary insurance coverage on all five aircraft, resulting in Starr Policy No. SASICOM60090019-06, taking effect on October 31, 2019 ("the 2019-2020 Policy").

The 2019-2020 Policy contained several provisions excluding certain types and causes of damage from coverage. The "Wear and Tear Exclusion" excludes any loss or damage due to "wear, tear, deterioration, [or] freezing." The "Conversion Exclusion" excludes loss or damage caused when "any person or organization with legal right to possession" of the aircraft converts, embezzles, or secretes the aircraft. In addition, the

2019-2020 Policy also contained a "Notice of Loss" provision, requiring the insured to file proof of loss within sixty days after the date of the loss. These and other policy provisions are discussed in more detail below.

Over the next year, Pacific Air continued its efforts to repossess the aircraft along numerous legal and diplomatic avenues. These efforts were unavailing, as the Directorate General of Civil Aviation ("DGCA")—the Indonesian equivalent of the FAA, and a government agency—refused to de-register the aircraft from the lessees' names. On October 5, 2020, Pacific Air submitted a claim for a total loss of the aircraft to Starr. The parties exchanged correspondence and documents related to the claim over the next several months. On May 18, 2021, Starr filed the instant case, seeking a declaratory judgment that it was not obliged to make any payments to Pacific Air under the 2019-2020 Policy. On August 2, 2021, Pacific Air filed its Answer and Counterclaim, alleging that Starr's refusal to cover the loss constituted a breach of contract.

### *Summary Judgment*

The Court begins by addressing the cross-motions for summary judgment, the briefs in support, and the responses and replies.

### I. Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] A

---

[4] Fed. R. Civ. P. 56(a).

genuine dispute exists if a reasonable juror could return a verdict for either party.[5] A fact is material if it "might affect the outcome of the suit under the governing law."[6] In considering a motion for summary judgment, a court must view all facts and reasonable inferences in the light most favorable to the nonmovant.[7] "Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party."[8]

"The interpretation of an unambiguous contract is a question of law to be determined by the court, and may be decided on summary judgment."[9] Under Oklahoma law,[10] "[w]hen policy provisions are clear, consistent, and unambiguous, [the court must] look to the plain and ordinary meaning of the policy language to determine and give effect to the parties' intent."[11] When multiple possible causes of damage appear, "the cause 'of a loss for the purpose of fixing insurance liability . . . is the dominant or efficient one that sets the other causes in operation.'"[12] In an insurance dispute like this one, the insured generally

---

[5] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[6] *Id.*

[7] *Id.*

[8] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[9] *Pub. Serv. Co. of Okla. v. Burlington N.R. Co.*, 53 F.3d 1090, 1096 (10th Cir. 1995) (citations omitted).

[10] The parties agree that Oklahoma law governs the dispute and the interpretation of the insurance contract. *See* Pl.'s Mot. Summ. J. (Dkt. 43), at 8–9; Def.'s Mot. Summ. J. (Dkt. 41), at 17.

[11] *Porter v. Okla. Farm Bureau Mut. Ins. Co.*, 330 P.3d 511, 515 (Okla. 2014).

[12] *Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 714 (10th Cir. 2021) (quoting *Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 133 (Okla. Civ. App. 2005)).

bears the initial burden of showing a covered loss, and the insurer then bears the burden of showing that the loss falls within an exclusionary clause.[13] The Court will mirror this progression by first taking up the Motion of the insured, Pacific Air, after examining and interpreting the contract provisions at issue.

## II. Contract Interpretation

Because contract interpretation is a question of law, the Court will first determine whether the terms at issue in the dispute are ambiguous, and, if they are not ambiguous, their meaning. By resolving the parties' disputes on the meaning of the terms, the fixed interpretations can then be applied in the Court's analysis of each independent summary judgment motion.

### A. Physical Damage

The 2019-2020 Policy defines "Physical Damage" as "direct and accidental physical loss of or damage to the aircraft, hereinafter called loss, but does not include loss of use or any residual depreciation or diminution in value, . . . if any, after repairs have been made."[14] The Court finds this term to be unambiguous, and the parties do not dispute that the aircraft have suffered "Physical Damage" within the meaning of this term.

### B. Wear and Tear Exclusion

The 2019-2020 Policy contains a Wear and Tear Exclusion, which provides that the policy does not apply "to loss or damage which is due and confined to . . . wear, tear, [or]

---

[13] *See Pittman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000).

[14] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 13.

deterioration."[15] The policy does not further define these terms. Therefore, the Court must give them effect "according to their ordinary or popular meaning."[16] We are not the first to do so. As the Sixth Circuit has noted, "[c]ourts frequently interpret wear and tear exclusions to connote the popular meaning of the expression, and may imply adjectives such as 'ordinary' and 'natural' to limit the breadth of exclusions."[17] "Deterioration" has been similarly interpreted in this limiting fashion.[18]

While Starr briefly notes that the text of the exclusion does not explicitly include the word "normal," it does not seem to seriously dispute that the provision carries with it at least *some* connotation of "ordinary or natural."[19] Without such a connotation, the exclusion would likely swallow the policy whole. However, Starr would not stray far beyond interpreting "wear, tear, [or] deterioration" to mean "ordinary or natural wear, tear, or deterioration."[20]

---

[15] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 8.

[16] *Barnes v. State Farm Mut. Auto. Ins. Co.*, No. CIV-15-25-C, 2015 WL 7458649, at *2 (W.D. Okla. Nov. 23, 2015) (quoting *Max True Plastering Co. v. U.S. Fidelity & Guar. Co.*, 912 P.2d 861, 865 (Okla. 1996)).

[17] *Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.*, 409 F.3d 342, 350 (6th Cir. 2005) (citing *Cyclops Corp. v. Home Ins. Co.*, 352 F. Supp. 931, 936 (W.D. Pa. 1973)).

[18] *See Libbey Inc. v. Factory Mut. Ins. Co.*, No. 06-CV-2412, 2007 WL 9757792, at *4–5 (N.D. Ohio June 21, 2007) (discussing competing interpretations which both encompass "natural" or "normal and inevitable" occurrences).

[19] Pl.'s Resp. (Dkt. 45), at 20–21.

[20] Pl.'s Mot. Summ. J. (Dkt. 43), at 12–14.

Pacific Air, referencing common dictionary definitions, argues that wear and tear connotes the inevitable damage that goes along with ordinary or reasonable use of a good.[21] Pacific Air would also go further, reading "wear, tear, [or] deterioration" to mean "wear and tear which occurs notwithstanding routine maintenance."[22] The suggestion seems to be that when routine maintenance is missed *for whatever reason*, any physical damage suffered because of the neglect is not "ordinary or natural," and therefore not excludable.[23]

The Court agrees with Pacific Air that embedded in the "ordinary or natural" sense of wear and tear is the notion of reasonable use and maintenance. However, Pacific Air's proposed categorical extension is a step beyond the ordinary, plain meaning of the terms. Some circumstances which lead to foregoing or missing maintenance may well harmonize with the meaning of wear and tear. Others may not. The "ordinary or natural" sense of the Wear and Tear Exclusion that we adopt, when applied to diverse circumstances, can discern between excludable and non-excludable instances of missed maintenance.

*C. Conversion Exclusion*

The 2019-2020 Policy contains an exclusion of coverage for "loss or damage to an aircraft due to conversion, embezzlement or secretion by any person or organization with legal right to possession of such aircraft under . . . lease, []or for any loss or damage during

---

[21] *See, e.g.*, Def.'s Resp. (Dkt. 44), at 4.

[22] *See Atlas S. Corp. v. Houston Marine Servs., Inc.*, No. 92-3350, 1993 WL 192870, at *1 (E.D. La. June 2, 1993), *aff'd as modified by* 26 F.3d 1119 (5th Cir. 1994).

[23] *See* Def.'s Resp. (Dkt. 44), at 4.

or resulting therefrom."[24] The parties' disputes about this policy term center on the meaning of "conversion."[25]

Pacific Air argues that conversion necessarily requires that a defendant "intentionally divert[] [property] for his own personal benefit."[26] From this, Pacific Air reasons that ongoing possession is also required for an act of conversion to fit within the exclusion; or at least that a subsequent act of abandonment cuts off the damages, and ends the exclusionary effect, caused by an initial act of conversion. Starr, for its part, provides case illustrations but does not offer a meaning of conversion beyond a general statement of Oklahoma law.

Neither of Pacific Air's proposed additions to the meaning of "conversion" get off the ground. Oklahoma law defines conversion as "the unauthorized assumption and exercise of dominion over personal property of another which is inconsistent with the rights of the owner."[27] The elements of the tort of conversion are: (a) right to possession; (b) some act by defendant that wrongfully interferes with that property right; and (c)

---

[24] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 8.

[25] Although neither party bases their arguments on the word, Starr does provide a definition for "secretion": "[t]o remove or keep from observation, or from the knowledge of others . . . esp[ecially] to hinder or prevent officials or creditors from finding it." *Secrete*, Black's Law Dictionary (11th ed. 2019).

[26] Def.'s Mot. Summ. J. (Dkt. 41), at 25 (quoting *Emcasco Ins. Co. v. CE Design, Ltd.*, 784 F.3d 1371, 1379 (10th Cir. 2015)).

[27] *Emcasco*, 784 F.3d at 1379 (quoting *Harmon v. Cradduck*, 286 P.3d 643, 649 (Okla. 2012)); *see also Steenbergen v. First Fed. Sav. & Loan of Chickasha*, 753 P.2d 1330, 1332 (Okla. 1987) (defining conversion as "any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein").

damages.[28] But Oklahoma law has long held that it is *not* necessary "that the alleged converter apply the property to his own use."[29] In addition, nothing in the above definitions necessarily requires any possession—much less sustained possession—by the defendant.[30] One who takes and destroys property is liable for conversion;[31] it is difficult to see why one who takes and abandons property would not similarly be liable for any resulting damage.[32]

The Court rejects Pacific Air's proposed extensions and construes "conversion" in accordance with the accepted, unambiguous definition in Oklahoma law: "the unauthorized assumption and exercise of dominion over personal property of another which is inconsistent with the rights of the owner."

*D. Notice Provision*

The 2019-2020 Policy imposed a duty on Pacific Air to notify Starr when a loss occurred. Specifically, the Notice Provision states that: "When loss occurs, the insured shall: . . . file proof of loss with the aviation managers within sixty (60) days after the date

---

[28] *See Metro. Life Ins. Co. v. Bradshaw*, 450 F. Supp. 3d 1258, 1264–65 (W.D. Okla. 2020) (quoting *White v. Webber-Workman Co.*, 591 P.2d 348, 350 (Okla. Civ. App. 1979)).

[29] *See id.* (quoting *Steenbergen*, 753 P.2d at 1332); *U.S. Zinc Co. v. Colburn et al.*, 255 P. 688, 688–90 (Okla. 1927).

[30] *See* Restatement (Second) of Torts § 226 – Conversion by Destruction or Alteration (noting that this Restatement section was broadened "to include destruction or alteration of the chattel by one not in possession of it).

[31] *See, e.g.*, Okla. Unif. Jury Inst. Civil § 27.1 – Conversion – Elements.

[32] *See also* Restatement (Second) of Torts § 228 – Exceeding Authorized Use.

of loss."[33] "Loss" is defined simply as "physical damage."[34] The parties dispute when the sixty-day clock begins; however, given the unambiguous construction of "physical damage" already established above, the plain, unambiguous meaning of the contract term is that notice is due within sixty days of damage.

One further bit of interpretation is necessary to determine the full scope of the Notice Provision. Oklahoma law generally requires that an insurer show that it was prejudiced by untimely notice in order to avoid liability, but parties can bargain around this rule by making time an essential part of the contract.[35] Time is an essential part of the contract when there is language specifying not only the timing requirements, but also the consequences of those requirements being breached.[36] "Although no particular form of expression is necessary, it must appear from the plainly expressed provisions contained in a contract, independent of all extraneous matter or circumstances, that it was the intention of the parties thereto that time should be the essence thereof."[37]

_____

[33] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 16.

[34] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 13.

[35] *See, e.g.*, *Dang v. UNUM Life Ins. Co. of Am.*, 175 F.3d 1186, 1189–90 (10th Cir. 1999); *Cont'l Cas. Co. v. Beaty*, 455 P.2d 684, 688 (Okla. 1969); *Dixon v. State Mut. Ins. Co.*, 126 P. 794, 796 (Okla. 1912).

[36] *See* Okla. Stat. tit. 15, § 174 ("Time is never considered as of the essence of a contract, unless by its terms expressly so provided."); *Beaty*, 455 P.2d at 688; *FDIC v. Kan. Bankers Sur. Co.*, 963 F.2d 289, 294 (10th Cir. 1992) (clear intent of parties to make time of the essence in contract, including fully set forth consequences of untimely notice).

[37] *Whitehurst v. Ratliff*, 181 P.2d 545, 548 (Okla. 1947) (quoting *Drumright et al. v. Brown et al.*, 184 P. 110, 110 (Okla. 1919)).

The 2019-2020 Policy contains no separate, explicit "time is of the essence" provision.[38] The nearest relevant provision, applicable to the same coverages, is the Payment of Loss provision, which states that:

> "[Starr] does not have to pay, and [Pacific Air] does not have the right to sue on this policy, unless all of its terms have been fully complied with and until thirty (30) days after the required proofs of loss have been filed with [Starr] and the amount of loss is determined as provided by the policy, nor at all unless commenced within twelve (12) months after the date of loss."[39]

The Notice Provision is undoubtedly one of the "terms" encompassed by this requirement, but there is no plain expression that time in particular is essential. As a matter of law, time is not of the essence of the 2019-2020 Policy, meaning that untimely notices in violation of the Notice Provision are not automatic bars to coverage. Rather, Starr must show that it suffered prejudice as a result of any late notice.

*E. Government Confiscation Endorsement*

The 2019-2020 Policy extends coverage to various acts of "[w]ar, hi-jacking and other perils." The Government Confiscation Endorsement states: "[T]his endorsement covers physical loss of or damage to the aircraft . . . caused by: . . . Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government . . . or public or local authority."[40] In addition, "this endorsement covers claims whilst the aircraft is outside the control of the insured by reason

---

[38] Notably, Pacific Air's lease agreements with Flying SAS and NGWPI do.

[39] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 16.

[40] Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 39 (Endorsement No. 15).

of any of the above perils."[41] This endorsement also has its own exclusion provisions, such as an exclusion from coverage of "loss, damage or expense caused by . . . [t]he repossession or attempted repossession of the aircraft."[42] The parties do not dispute the meaning of these unambiguous terms.

### F. 2018-2019 Lessee Insurance Provision

In January 2019, an endorsement was added to the 2018-2019 Policy which required that lessees of the aircraft under the policy carry their own primary insurance. This endorsement further provided that "[Pacific Air] agrees to notify [Starr] if the primary insurance coverage required in this condition is not maintained. Notice shall be mailed to [Starr] within ninety (90) days of [Pacific Air's] knowledge of the lack or insufficiency of required insurance."[43] The parties do not dispute the meaning of this unambiguous provision.

## III. Pacific Air's Motion for Summary Judgment

Pacific Air moves for summary judgment on Starr's initial declaratory judgment claim, as well as Pacific Air's own breach of contract counterclaim. We address each in turn.

### A. Wear and Tear Exclusion

Pacific Air argues that the physical damage suffered by its aircraft is not "ordinary or natural" wear and tear. Normal use of an aircraft involves regular flights and routine

---

[41] *Id.*

[42] *Id.*

[43] Pl.'s Compl. (Dkt. 1), at 12.

maintenance, not months of neglect and exposure to the elements. Therefore, Pacific Air says, any deterioration incurred by the lessees' abandonment goes beyond the wear and tear contemplated in the Exclusion.

Starr responds that all of the damage suffered is the natural and foreseeable consequence of Flying SAS and NGWPI's decision to cease all upkeep of the aircraft. Non-use and the inevitable effects of time and weather are not like an exogenous event such as a lightning strike, which is the normal province of insurance coverage. Therefore, Starr says, the decay and deterioration caused by the lessees' actions is properly excluded from coverage.

The parties do not dispute the material facts relating to this provision: the lessees ceased upkeep on the aircraft, and exposure to the elements caused physical damage. As a matter of law, Pacific Air's view more closely aligns with the Court's interpretation of "wear, tear, [or] deterioration." As discussed above, a common understanding of "wear and tear" invokes some sense of normal, ordinary, and reasonable use and maintenance, not years of corrosion, animals nesting in electrical wires, and the theft of critical parts. The physical damage suffered by the aircraft is not excludable under the Wear and Tear Exclusion. Pacific Air is entitled to summary judgment on this issue.

*B. Conversion Exclusion*

Pacific Air's arguments relating to the Conversion Exclusion are largely confined to the legal and definitional theories already rejected above. To the extent that there remains a factual dispute, it concerns the timing of the lessees' abandonment of the aircraft and the DGCA's alleged confiscation, discussed below. But as regards the Conversion Exclusion,

14

the undisputed facts clearly show that the lessees took action inconsistent with Pacific Air's property rights. Failing to make lease payments, failing to maintain the integrity of the aircraft, and resisting Pacific Air's access to the aircraft all exceeded the uses authorized by the leases, and ran counter to Pacific Air's own property interests.[44] At least some of the physical damage that followed was "during or resulting therefrom." As a matter of law, those damages are excludable from coverage. Pacific Air is not entitled to summary judgment on this issue.

### C. Notice Provision

Pacific Air offers several alternate theories for why the Notice Provision does not operate to preclude coverage. First, it argues that it notified Starr of its claim "within sixty (60) days of discovering that its efforts to repossess the aircraft were hopeless." However, the Notice Provision unambiguously requires notice within sixty days of the date of physical damage, not upon determinations of futility.

Second, Pacific Air argues that, while it may have had suspicions of pending damage in 2019, it did not have knowledge of actual, irreparable damage until around the time it gave notice. To support this contention, Pacific Air cites to Mr. Lofton's deposition testimony, wherein he discussed seeing "risk" of loss, or "conditions that might lead to a loss," in mid-2019. Starr counters with contemporaneous emails from Mr. Lofton, allegations contained in Pacific Air's lawsuits against the lessees, and statements in the

---

[44] Indeed, as Pacific Air noted in its lawsuits against the lessees, these actions violated numerous terms and duties under the aircraft lease agreements. *See* Ex. 6 (Dkt. 43), at 7–8; Ex. 7 (Dkt. 43), at 7–8.

Notice of Claim Letter, all of which suggest that Pacific Air knew of physical damage to at least some of the aircraft months before it gave notice to Starr.

Despite the hedging statements by Mr. Lofton, there is clear evidence that Pacific Air knew that the aircraft had suffered physical damage more than sixty days prior to the Notice of Claim Letter dated October 5, 2020. The Letter itself discusses Mr. Lofton's "walk-around inspections" of several of the aircraft in "late 2019 and early 2020," where he noticed "that the aircraft are missing certain parts and are in various stages of ruin."[45] It also notes that "[p]ictures taken months ago of these aircraft from a distance show their decay."[46] At least one of those pictures is in the record, and it shows, in Mr. Lofton's words, that "plants have now grown up through the bottom of the aircraft."[47] Regarding the other aircraft, Mr. Lofton stated at that time that "they are in as bad of condition."[48] A July 13, 2020, email from Mr. Lofton states, in reference to all five aircraft, that they are "[c]orroded, Rusted, lizards and mice living in them, parked in the grass. Parts have been stolen from them."[49] The Court finds that there is no genuine dispute of material fact that Pacific Air's notice of loss was untimely under the terms of the policy.

Pacific Air argues that, even if notice was untimely, the Notice Provision does not preclude coverage because Starr was not prejudiced by the untimely notice. Pacific Air

---

[45] Ex. 36 (Dkt. 41).

[46] Ex. 36 (Dkt. 41).

[47] Ex. 31 (Dkt. 41), at 5–6 (July 27, 2020, email from Mr. Lofton).

[48] *Id.*

[49] Ex. 31 (Dkt. 41), at 6–7 (July 13, 2020, email from Mr. Lofton).

points to its many efforts to regain control of the aircraft, and to forestall any further damage, and asserts that Starr could not have done anything differently. Starr suggests that the continued deterioration and damage to the aircraft between Pacific Air's learning of the loss and its eventual notice to Starr establishes prejudice. Starr also notes a statement by Mr. Lofton suggesting that he hoped that Starr, as a large insurance company, could have exerted additional pressure to get the aircraft released following the claim letter.[50] Although Starr has not described in detail the actions it may have taken had it gotten timely notice, it has not offered totally "[u]nsupported conclusory allegations."[51] Rather, the question of what, if anything, Starr could have done to mitigate damage with earlier notice represents the kind of uncertain factual dispute appropriate for determination by a jury.[52]

Because there is a genuine dispute of material facts as to whether or not Starr was prejudiced by Pacific Air's untimely notice of loss, summary judgment is not appropriate on this issue.

---

[50] Ex. 18 (Dkt. 43), 163:21–164:5 ("I was—I'll be honest; I was hoping the insurance company could put pressure on them even. Deregister—you know, insurance companies have a certain amount of clout in countries, and I was hoping that that might even happen, you know.").

[51] *L & M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000).

[52] At a certain point, notice becomes so untimely that courts sometimes find prejudice as a matter of law. *See, e.g.*, *Noon Realty, Inc. v. Aetna Ins. Co.*, 387 N.W.2d 465, 467 (Minn. Ct. App. 1986) (seven-year lapse between claim and notice); *Metal Bank of Am., Inc. v. Ins. Co. of N. Am.*, 520 A.2d 493, 500 (Pa. Super 1987) (five-year lapse); *Beaver Excavating Co. v. United States Fid. & Guar. Co.*, 709 N.E.2d 858, 863 (Ohio Ct. App. 1998) (nine-year lapse). The delay at issue here does not approach that threshold.

*D. Voidness*

An insurance contract may be held void if formed on the basis of fraud, misrepresentation, or concealment of facts.[53] If the misrepresentation goes to "the true nature of the proposed agreement," the contract may be void *ab initio*.[54] If the misrepresentation goes to the "terms, quality or other aspects of a contractual relationship," the contract may be voidable after the fact.[55] The distinction generally matters where an innocent third party is involved,[56] which is not the case here.

Pacific Air asks for summary judgment on Starr's claim that the 2019-2020 Policy was void. That claim involves two theories of alleged misrepresentations leading up to the formation of the policy. The first of these theories concerns the 2018-2019 Lessee Insurance Provision.[57] Pacific Air argues that the Insurance Provision is wholly irrelevant to this dispute, which arises out of the 2019-2020 Policy. Alternatively, Pacific Air states

---

[53] *See Harkrider v. Posey*, 24 P.3d 821, 825–27 (Okla. 2000); *see also* 16 Williston on Contracts § 49:46 (4th ed. 2020); Okla. Stat. tit. 36, § 3609. The 2019-2020 Policy also contained its own Fraud or Misrepresentation provision, which states that "[t]his policy shall be void if [Pacific Air] has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject matter thereof or in case of any fraud . . . by [Pacific Air] touching any matter relating to this insurance or the subject thereof." Pl.'s Compl. Ex. 3 (Dkt. 1-3), at 18.

[54] *Harkrider*, 24 P.3d at 825–27.

[55] *Id.*

[56] *Id.*

[57] The Complaint is not a model of clarity here. Initially, it seems to suggest that the 2018-2019 Lessee Insurance Provision is part of the 2019-2020 Policy, and that it is a separate ground for denying coverage under the 2019-2020 Policy. As the later motions and briefing make reasonably clear, this issue is best understood as another alleged misrepresentation or concealment sufficient to render the 2019-2020 Policy void.

that in any case it never gained positive knowledge that the Insurance Provision was violated, either before or since the formation of the 2019-2020 Policy. Starr contends that certain statements in the record suggest that Pacific Air did learn that the lessees were not maintaining insurance by Summer 2019 at the latest.[58]

The second misrepresentation theory concerns the physical state of the aircraft. The 2019-2020 Policy was entered into in October 2019. Pacific Air argues that at that time, while it may have had reasons to be concerned about the aircrafts' condition, as far as it knew for sure they were in "good" and "repairable" shape.[59] Once again, Starr points to other statements in the record by Mr. Lofton that suggest that Pacific Air knew in June 2019 that the aircraft had suffered corrosion damage and needed major repairs.[60] Pacific Air counters that these statements were hyperbole intended to induce the lessees to return control of the aircraft.[61]

There is a similar genuine dispute of material facts underlying both theories of this claim: what exactly did Pacific Air know about the status of the aircraft at the time it entered into the 2019-2020 Policy? While the insurance issue may be a lesser aspect that could render the contract voidable after the fact, and the physical condition of the aircraft may be an essential element that could render the contract void *ab initio*, the distinction is

---

[58] *See, e.g.*, Ex. 23 (Dkt. 43), at 12–13.

[59] Def.'s Mot. Summ. J. (Dkt. 41), ¶¶ 35–37; Ex. 18 (Dkt. 43), 115:1–24.

[60] *See, e.g.*, Exs. 13, 14 (Dkt. 43).

[61] Def.'s Resp. (Dkt. 44), at 14–15.

without a difference at this point. Summary judgment is inappropriate on this issue given the live factual disputes.

### E. Breach of Contract Counterclaim

We now turn to Pacific Air's request for summary judgment on its own breach of contract counterclaim. To prove its claim, Pacific Air must show "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach."[62] Evaluation of this counterclaim in isolation from the various coverage and exclusion issues already discussed is impossible, and we have already determined that Pacific Air is not entitled to summary judgment on most of those issues. However, the counterclaim raises several unique questions that bear addressing.

#### i. Physical Damage and Timing

As mentioned above, the parties do not dispute that the aircraft have suffered Physical Damage within the meaning of the 2019-2020 Policy's coverage terms. However, Starr argues that the physical damage occurred, or at least began, before the 2019-2020 Policy took effect, and therefore is not a covered loss. Pacific Air disagrees. Once again, the dispute largely turns on the various statements of Mr. Lofton, and whether one characterizes his representations as hyperbolic posturing or accurate reportage. Starr also refers to Pacific Air's lawsuits against Flying SAS and NGWPI, filed in June 2019, which allege that at least some of the aircraft were already corroding due to lack of maintenance. Pacific Air replies that those allegations were made "on information and belief" precisely

---

[62] *Digital Design Grp., Inc. v. Info. Builders, Inc.*, 24 P.3d 834, 843 (Okla. 2001).

because it did not have actual knowledge of the condition of the aircraft. There remains a genuine dispute as to when exactly the aircraft suffered what specific damage. Summary judgment is inappropriate on this issue.

### ii. Government Confiscation

Pacific Air also moves for summary judgment on an alternative, independent ground to the general physical damage coverage: the Government Confiscation Endorsement. The Endorsement, Pacific Air says, extends coverage to the damage at issue here, which was caused by the DGCA, an agency of the Indonesian government, adversely exercising control over the aircraft.[63] And, per Pacific Air, the DGCA's obstruction first began in November 2019, within the 2019-2020 Policy coverage period.

Starr initially argues that damage covered by the Endorsement is subject to its own exclusions, including one provision that excludes damage or expenses caused by the attempted repossession of the aircraft. But, as Pacific Air notes, there is no evidence that its attempts to regain access have caused any of the damage that the aircraft have suffered. Starr next argues that Pacific Air's notice of the confiscation and damage was untimely. This timeliness argument tracks the one already discussed: Pacific Air's notice was clearly untimely within the terms of the policy,[64] but there is a genuine dispute as to whether Starr

---

[63] As Pacific Air notes, all of the terms in the Endorsement—confiscation, embezzlement, and seizure—carry a similar connotation along these lines.

[64] That is to say, the sixty-day clock on the Notice Provision began at the latest when Pacific Air says it first became aware of the DGCA's confiscatory action and resulting damage, November 2019, *not* when Pacific Air decided that it had exhausted all avenues to recover the aircraft, sometime around October 2020.

was prejudiced by the delay. Starr also questions the timing of the alleged confiscation, and whether it took place before the 2019-2020 Policy went into effect. Again, like the above timing discussion, there seems to be a genuine dispute, based on the varying statements of Mr. Lofton, of the timeline facts relating to confiscation.

Finally, Starr argues that the DGCA has never confiscated the aircraft within the meaning of the Endorsement, and therefore the damage suffered is not a covered loss. This is so, Starr says, because the motive actor is not the DGCA, but the lessees: until the lessees give up their registration of the aircraft, the DGCA is simply and properly recognizing the lessees' rightful control. In support, Starr points to email correspondence from Mr. Lofton repeatedly asking lessees to deregister the aircraft[65] and deposition testimony of Mr. Lofton stating that the FAA needs a deregistration form from the DGCA in order to reregister the aircraft.[66]

While Pacific Air cites to caselaw, most of which involves undoubted acts of government confiscation, it offers little in the way of disputed facts on this issue. The lessees totally abandoned the aircraft, therefore any remaining difficulties in retaking control must be attributable to the DGCA, says Pacific Air. Yet Pacific Air does not seem to contest that the lessees have not given up their registration of the aircraft, [67] undercutting

---

[65] Ex. 18 (Dkt. 41) (email chain between Mr. Lofton and a representative of Asian One Air, a sublessee of NGWPI); Ex. 20 (Dkt. 43) (email chain between Mr. Lofton and a representative of Flying SAS).

[66] Ex. 18 (Dkt. 43), 160:23–161:24; 163:3–10.

[67] At the very least, it does not seem to have been disputed at the time of the claim letter and the Complaint that the lessees had not deregistered the aircraft on their end then. *See, e.g.*, Ex. 18 (Dkt. 43), 159:19–161:24. As the case has proceeded, there have been

a theory of complete abandonment. Nevertheless, there is some evidence in the record that could support a conclusion that the DGCA's actions fall within the Endorsement. For example, in some of the same emails and testimony that Starr cites, Mr. Lofton suggests that the DGCA could, or indeed may have a duty to, deregister the aircraft without the lessees' say so. Mr. Lofton also suggests possible corrupt motivations on the part of the DGCA to not deregister.[68] Altogether, the Court finds that there remains a genuine dispute of material fact as to whether the DGCA actually had agency to deregister the planes, and if so whether its actions constituted covered acts of confiscation.

### F. Conclusion

In sum, the Court finds that Pacific Air is entitled to summary judgment only on the inapplicability of the wear and tear exclusion. Pacific Air's Motion for Summary Judgment (Dkt. 41) is **GRANTED IN PART** and **DENIED IN PART** accordingly. Many of the other issues were found to be subject to ongoing disputes of material fact. As such, there is limited new ground to cover as the Court considers Starr's Motion for Summary Judgment (Dkt. 43).

## IV. Starr's Motion for Summary Judgment

Like Pacific Air, Starr moves for summary judgment on the issues relating to its own claims, as well as on Pacific Air's counterclaims.

---

conflicting indications of whether the aircraft are accessible and whether the lessees have given up their registration. *See, e.g.*, Ex. 1 (Dkt. 53).

[68] *See* Ex. 15 (Dkt. 41); Ex. 18 (Dkt. 43), 158–163; 196:10–197:21; *see also* Ex. 29 (Dkt. 41) (email correspondence from Mr. Lofton to the head of the DGCA).

*A. Wear and Tear Exclusion*

As determined above, there is no dispute of material fact on this issue, and the Court's interpretation of the contract term favors Pacific Air. Starr is not entitled to summary judgment on the wear and tear exclusion.

*B. Conversion Exclusion*

As determined above, there is no dispute of material fact on this issue. The lessees, organizations with a legal right to possession, took actions inconsistent with the rights of Pacific Air, resulting in physical damage. Under Oklahoma law, and our interpretation of the contract terms, these acts clearly amount to conversion. At least some portion of the physical damage to the aircraft is excludable from coverage under the Conversion Exclusion, and Starr is entitled to summary judgment on this issue.

*C. Notice Provision*

As determined above, the undisputed facts clearly show that Pacific Air's notice to Starr of the physical damage was untimely within the terms of the policy. Starr is entitled to summary judgment on that issue. However, there does remain a genuine dispute as to whether Starr was prejudiced by the late notice, to be determined by the jury.

*D. Voidness*

As determined above, there remain genuine disputes of material fact as to both theories of the voidness argument. It will be for the jury to decide if Pacific Air misrepresented its knowledge about either the lessee insurance status or the physical condition of the aircraft at the time the 2019-2020 Policy was formed.

*E. Breach of Contract Counterclaim*

As determined above, there remain genuine disputes of material fact as to four aspects of Pacific Air's counterclaim. First: when did the aircraft first begin to suffer physical damage? Second: did the DGCA's actions constitute a government confiscation within the meaning of the policy terms? Third: if so, when did that confiscation begin? And fourth: was Starr prejudiced by Pacific Air's untimely notice of the DGCA's actions? Summary judgment is inappropriate for this issue.

*F. Conclusion*

In sum, the Court finds that Starr is entitled to summary judgment on the applicability of the conversion exclusion and the untimeliness of Pacific Air's notice of loss. Any physical damage solely attributable to the conversion of the aircraft by the lessees is excluded from coverage. Under Oklahoma's efficient proximate cause doctrine, any physical damage primarily set into motion by the lessees' conversion is also excludable. However, given the open disputes about the possible government confiscation—another potential cause of damage—as well as the full timeline of events, the amount of the loss excluded by the conversion provision will depend on the jury's determination of other outstanding issues. Those issues also include the possibility that the entire 2019-2020 Policy is void or voidable, or that Starr's liability is reduced due to prejudice suffered from the untimely notice. Starr's Motion for Summary Judgment (Dkt. 43) is **GRANTED IN PART** and **DENIED IN PART** accordingly.

### *Motion to Compel*

In its Motion to Compel (Dkt. 48), Pacific Air seeks to compel Starr to produce documents relating to Starr's initial investigation of Pacific Air's coverage claim. Specifically, Pacific Air seeks documents "relating to or reflecting communications of any kind that in any way relate to the Policy or the Pacific Air Entities' Claim under the Policy" and "the entire Claim file relating to the Pacific Air Entities' claim made to Starr."[69] Starr objects that the documents are protected by the attorney-client privilege and the attorney work product privilege. Pacific Air argues that the documents are ordinary business material not protected from disclosure.

The Federal Rules of Civil Procedure permit discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."[70] "The party seeking to assert the attorney-client privilege or the work product doctrine as a bar to discovery has the burden of establishing that either or both is applicable."[71] In diversity cases, attorney-client privilege claims are governed by state law, while work product claims are governed by federal law.[72]

---

[69] Def.'s Mot. Compel (Dkt. 48), at 2–3; Pl.'s Resp. (Dkt. 52), at 2.

[70] Fed. R. Civ. P. 26(b)(1).

[71] *Barclaysamerican Corp. v. Kane*, 746 F.2d 653, 656 (10th Cir. 1984).

[72] *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998). Courts often merge the analyses. *Lindley v. Life Investors Ins. Co. of Am.*, 267 F.R.D. 382, 395 (N.D. Okla. 2010) *modified by* 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010)

In Oklahoma law, attorney-client privilege is established when "the status occupied by the parties was that of attorney and client and . . . their communications were of a confidential nature,"[73] and when those communications were "made for the purpose of facilitating the rendition of professional legal services to the client."[74] In commercial contexts, communications are often of mixed business and legal import.[75] When possible, non-privileged business matter may be severed and separately produced from privileged legal communications.[76] Determining whether the privilege applies is a fact-driven and circumstantial exercise.[77]

The attorney work product privilege is governed by Federal Rule of Civil Procedure 26(b)(3).[78] Generally, the privilege protects "documents and tangible things that are prepared in anticipation of litigation" from discovery.[79] To determine whether a document was prepared in anticipation of litigation, "courts should consider whether 'in light of the nature of the document and the factual situation in the particular case, the document can

---

[73] *Chandler v. Denton*, 741 P.2d 855, 865 (Okla. 1987).

[74] Okla. Stat. tit. 12, § 2502(B).

[75] *See Lindley*, 267 F.R.D. at 391–92.

[76] *See Scott v. Peterson*, 126 P.3d 1232, 1234 (Okla. 2005) (citing *Hurt v. State*, 303 P.2d 476, 481 (Okla. Crim. App. 1956)).

[77] *See Lindley*, 267 F.R.D. at 391–92. Both parties urge that communications relating to insurance coverage opinions receive the benefit of a presumption, though they disagree on whether that presumption should be of privilege or nonprivilege. We decline to adopt either presumption.

[78] Fed. R. Civ. P. 26(b)(3); *see Frontier Refining*, 136 F.3d at 702–03.

[79] Fed. R. Civ. P. 26(b)(3)(A).

fairly be said to have been prepared or obtained *because of* the prospect of litigation.'"[80] Documents that would have been produced in the ordinary course of business are not protected.[81] In addition, at the time the documents were prepared, there must have been at least "a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable."[82]

Starr's blanket claims of privilege are not protected by either the attorney-client or the attorney work product doctrines. Starr leads off by arguing that the documents in question are not relevant to this matter, and therefore do not fall within the category of discoverable materials.[83] At the very least in regards to Pacific Air's breach of contract counterclaim, which hinges on Starr's alleged wrongful denial of coverage, the claim file and related investigatory documents are clearly relevant. This initial argument fails.

Pacific Air submitted its claim on October 5, 2020, and Starr retained legal counsel the next day to "(1) respond to counsel for [Pacific Air], (ii) provide legal advice, (iii) recommend strategy regarding a unique claim, and (iv) investigate the claim and allegations made by [Pacific Air's] counsel."[84] Starr argues that *all* communications with

---

[80] *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. CIV-08-1125-C, 2010 WL 2594828, at *5 (W.D. Okla. June 22, 2010) (quoting *Retail Brand Alliance, Inc. v. Factory Mut. Ins. Co.*, No. 05 Civ 103 1(RJH)(HBP), 2008 WL 622810, at *4 (S.D.N.Y. Mar. 7, 2008)).

[81] *See id.*

[82] *Agility Public Warehousing Co. K.S.C. v. Dep't of Def.*, 110 F. Supp. 3d 215, 228 (D.D.C. 2015) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).

[83] Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.").

[84] Pl.'s Resp. (Dkt. 52), at 6–7.

its retained counsel were "related to . . . legal advice and strategy,"[85] and therefore protected by the attorney-client privilege. But Starr has fallen far short of demonstrating that such a blanket protection is justified. By Starr's own description, at least some of its retained counsel's duties included investigating the insurance claim, an ordinary business function.[86] Any documents or communications whose primary purpose is business related, and that are safely separable from legal documents and communications, are not protected by the attorney-client privilege.

Starr also argues that all documents and communications with its retained counsel were in anticipation of litigation, and therefore protected by the attorney work product doctrine. Starr anticipated litigation from the moment it received Pacific Air's claim, it says, solely because that claim was submitted by counsel for Pacific Air. But the mere fact that the claim was submitted via counsel is insufficient to serve as an objectively reasonable basis for subjective anticipation of litigation.[87] In addition, it seems likely that at least some of the requested documents—namely those already discussed relating to investigation of

---

[85] *Id.*

[86] *Id.* (stating that duties included "investigat[ing] the claim and allegations made by [Pacific Air's] counsel").

[87] With sufficient evidence, a subjective anticipation of litigation may be objectively reasonable even early in an insurance claim dispute. *See, e.g.*, *Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 664 & n.4 (S.D. Ind. 1991) (noting that if "reliable and convincing evidence established the existence of all elements necessary for a good faith claims denial such that it was improbable that any reasonably foreseeable results of later investigations would change that decision," an objectively reasonable anticipation of litigation could arise prior to final claim adjudication). In its initial response to the claim letter, counsel for Starr noted that it was Starr's position that "the Policy *may* not provide coverage for some or all of the claims." Ex. 2 (Dkt. 52). This suggests that the claim letter itself was not enough to convince Starr that claim denial and litigation were inevitable.

the claim—would have been produced in the ordinary course of business, regardless of the prospect of litigation.[88] Those documents and communications not prepared *because of* an objectively reasonable prospect of litigation are not protected by the attorney work doctrine.

In sum, Starr has failed to meet its evidentiary burden to show that all of the requested documents are protected by either the attorney-client or the attorney work product privilege. Accordingly, Pacific Air's Motion to Compel (Dkt. 48) is **GRANTED**. Starr shall produce all nonprivileged documents responsive to Pacific Air's Requests for Production Nos. 5 and 6. For those documents that Starr believes are justifiably privileged, Starr shall create a privilege log that "describe[s] the nature of the documents . . . and do[es] so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."[89]

### *Motion for Protective Order and Motion to Withdraw Protective Order*

On January 17, 2023, Pacific Air filed a Motion for Protective Order (Dkt. 49), requesting an order that would allow Pacific Air to perform repair work on the aircraft without being later held accountable for spoliation of evidence. Starr filed a Response (Dkt. 53), arguing that the Motion (Dkt. 49) should be denied because Starr desired an

---

[88] Starr essentially admits as much in its Response when it notes that "[i]f this had been a standard evaluation conducted by Starr, the evaluation would have been handled by Starr's claims department [rather than outside counsel]." Pl.'s Resp. (Dkt. 52). But if some version of the evaluation would have taken place regardless, it follows, or at least is very likely that, some of the same documents would be produced with or without litigation.

[89] Fed. R. Civ. P. 26(5)(A)(ii).

opportunity to inspect the aircraft for damage, though it could not do so until the aircraft were deregistered, permitting access. Pacific Air filed a Reply (Dkt. 55), arguing that Starr could access the aircraft—or if it could not, that this would reinforce Pacific Air's government confiscation argument. Pacific Air reemphasized its need to recover and repair the aircraft.

On March 27, 2023, Pacific Air filed its Motion to Withdraw Motion for Protective Order (Dkt. 66), stating that the issues presented in the Motion for Protective Order (Dkt. 49) were moot. Starr filed a Response (Dkt. 69) requesting that the Court order that the aircraft be preserved through the end of litigation, but not formally opposing the Motion (Dkt. 66).

Per the last two Joint Motions to Continue Trial (Dkts. 71, 75), the parties do not appear to consider this a live dispute. Accordingly, the Court **GRANTS** Pacific Air's Motion to Withdraw Motion for Protective Order (Dkt. 66); the Motion for Protective Order (Dkt. 49) is hereby **WITHDRAWN**.

### *Motion to Strike*

On February 1, 2023, Starr filed its Expert Witness List (Dkt. 51). Contemporaneously, Starr provided Pacific Air with an expert witness disclosure and report by Douglas E. Stimpson and Mark A. Pottinger.[90] On March 28, 2023, Pacific Air filed its Motion to Strike Expert Disclosure and Report (Dkt. 67). Starr filed a Response

---

[90] Fed. R. Civ. P. 26(a)(2).

(Dkt. 68), and the Court is ready to rule on the matter. First, however, we must determine what exactly Pacific Air is moving for.

The Motion (Dkt. 67) makes several references to Federal Rule of Civil Procedure 26(a)(2), the rule governing expert witness disclosure and reports. If a party fails to comply with Rule 26(a), the expert witness and report can be excluded from use at trial pursuant to Rule 37(c)(1).[91] However, the arguments advanced, and the sources cited in support, all suggest that Pacific Air's real objection is to the substantive import of the report under Federal Rules of Evidence 702 through 704. Accordingly, the Court will construe the Motion (Dkt. 67) as a challenge to the admissibility of the expert opinion testimony under the Federal Rules of Evidence.[92]

Pacific Air advances two arguments for why Starr's expert report should be excluded as improper. First, Pacific Air argues that there is no unique expert analysis in the report. Stimpson and Pottinger have not inspected the aircraft in person, so, says Pacific Air, the "facts and data" grounding their opinion consist largely of reviewing Mr. Lofton's descriptions of the aircraft via email correspondence in the record. Starr responds that Stimpson and Pottinger, like all experts, rely on the documents and testimony produced in

---

[91] Fed. R. Civ. P. 37(c)(1).

[92] Pacific Air asks that it be allowed to supplement the Motion (Dkt. 67) to brief *Daubert*-specific issues if the Court construes the Motion as a *Daubert* motion. The Court declines to do so. Pacific Air may file a separate *Daubert* motion in accordance with the Scheduling Order (Dkt. 76) if it wishes to challenge the scientific qualifications or methods of Starr's experts. The merits of those issues are not relevant to the more limited questions the Court answers in deciding this Motion.

discovery. In addition, Starr notes that the experts' report includes additional factual sources such as the aircraft instruction manual and pictures of the aircraft.

Expert testimony is appropriate when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[93] "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."[94] The Court finds no categorical problem with Starr's experts relying on evidence in the record, even when that evidence consists of fact witness statements. In addition, the Court agrees with Starr that the report goes beyond "simply regurgitat[ing]" record evidence, and that, for example, expert opinion on aircraft storage could prove helpful to the trier of fact.[95]

Next, Pacific Air contends that the expert report improperly offers opinions on legal standards and conclusions. In particular, Pacific Air refers to portions of the expert report that discuss the insurance policy provisions and offer opinions on the legal effect of certain clauses and actions. Starr responds that its experts have not been designated to weigh in on ultimate legal issues, but rather to opine on factual disputes that may underlie such issues.

While expert opinions on "ultimate issues" are not automatically objectionable,[96] legal opinions or conclusions are not favored.[97] As the parties agree, contract interpretation

---

[93] Fed. R. Evid. 702.

[94] Fed. R. Evid. 703.

[95] Def's Mot. Strike (Dkt. 67), at 5–6; *see Gust v. Jones*, 162 F.3d 587, 594 (10th Cir. 1998) (helpfulness to trier of fact is touchstone of admissibility).

[96] Fed. R. Evid. 704(a).

[97] *See Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007).

is a question of law in Oklahoma,[98] a question already answered above. An expert opinion offering legal conclusions, especially on issues comprehensible by lay jurors, is usually not helpful to the trier of fact, and therefore excludable.[99]

The Court agrees with Pacific Air that some of the opinions expressed in the expert report are legal conclusions about the meaning of, and duties arising under, the policies. However, the Court also agrees with Starr that some of the experts' opinions likely are admissible, and that a blanket exclusion would be premature. Pacific Air does not lack for tools—such as *Daubert* motions, motions *in limine*, and objections at trial—to ensure that Starr's expert testimony is confined to its appropriate scope before the jury. The Court will take action to exclude improper testimony at the proper time; for now, Pacific Air's Motion to Strike Expert Disclosure and Report (Dkt. 67) is **DENIED**.

### *Conclusion*

For the foregoing reasons: Pacific Air's Motion for Summary Judgment (Dkt. 41) is **GRANTED IN PART** and **DENIED IN PART** as discussed above; Starr's Motion for Summary Judgment (Dkt. 43) is **GRANTED IN PART** and **DENIED IN PART** as discussed above; Pacific Air's Motion to Compel (Dkt. 48) is **GRANTED**; Pacific Air's

---

[98] *See Dillard & Sons Const., Inc. v. Burnup & Sims Comtec, Inc.*, 51 F.3d 910, 914 (10th Cir. 1995); *Davis v. Fed. Ins. Co.*, 382 F. Supp. 3d 1189, 1194 (W.D. Okla. 2019).

[99] *See Denton v. Nationstar Mortgage LLC*, 18-cv-241-GKF-JFJ, 2020 WL 3261008, at *2–3 (N.D. Okla. May 1, 2020) (expert's proposed testimony on industry standards, guidelines, and practices was admissible; conclusions as to legal standards and duties were not).

Motion to Withdraw Motion for Protective Order (Dkt. 66) is **GRANTED**; and Pacific

Air's Motion to Strike Expert Disclosure and Report (Dkt. 67) is **DENIED**.

      **IT IS SO ORDERED** this 1st day of September 2023.


_____

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE